TRINA A. HIGGINS, United States Attorney (#7349)
SAM PEAD, Assistant United States Attorney (#11945)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:22-cr-24 TS |
| Plaintiff, | : | UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO |
| vs. | : | DISMISS COUNT 2 OF THE INDICTMENT [ECF No. 23] |
| CODY BYRON TEERLINK, | : | |
| | | Judge Ted Stewart |
| Defendant. | : | |

---

The United States, by and through the undersigned Assistant United States

Attorney (Sam Pead), hereby responds to the Defendant's motion to dismiss count 2 of

the indictment (ECF No. 23) (hereinafter "Motion") and prays the Court to deny this

Motion.

## I. Factual Summary for Count 2

On March 21, 2016, the Defendant pleaded guilty to *Driving under the Influence*

*of Alcohol* in the Third District Court (case no. 151907906), State of Utah, a 3rd degree

felony under Utah law, that carried a maximum punishment of five years in prison.[1] The Defendant was sentenced for this felony conviction on July 11, 2016.

On March 12, 2021, the Defendant went into a Scheels retail store in Sandy, Utah, to purchase a firearm (a Ruger .338 rifle). As part of the process of buying a firearm, the Defendant filled out an ATF 4473 form that included a number of questions about the purchaser's/applicant's background. In answering these questions, the Defendant indicated that he was not a convicted felon, though this claim (as evidence by the conviction above) was demonstrably false. The Defendant was (erroneously) allowed to purchase (and thereby possess) the Ruger .338 rifle.

The Defendant later (on May 8, 2021) made a call to the Bureau of Criminal Identification (BCI), and during this phone call told a BCI representative that he had guns.

The Ruger .338 rifle was manufactured and shipped outside of the State of Utah, and was therefore in and affecting interstate commerce.

The United States presented the Defendant's case to the grand jury who returned an indictment that included (as count 2) the charge of *Felon in Possession of a Firearm* for possessing the firearm he unlawfully purchased on March 12, 2021.

The Defendant now moves the Court to dismiss count 2 of the indictment.

## II. Argument

### A. Summary of the Defendant's Argument

---

[1] *See* Utah Code Ann. § 76-3-203(3).

The Defendant argues that, as a result of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, --- U.S. ---, 142 S. Ct. 2111 (2022), and the legal test announced therein, his charge for being a *Felon in Possession of a Firearm or Ammunition* under 18 U.S.C. § 922(g)(1), is "invalid."[2] Motion at pg. 3.

In *Bruen*, the Court clarified the analysis to use in determining whether a regulation comports with the Second Amendment.

First, courts must determine whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2126. If it does not, the analysis ends, and the government's regulation is valid.

If the conduct at issue *is* covered by the Second Amendment "the Constitution presumptively protects that conduct." *Id.* To overcome the presumption, the governmental entity must show "that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*.

In his Motion, the Defendant first argues that because he is a citizen of the United States the Second Amendment unquestionably provides him with the right to possess

---

[2] Though the Defendant never explicates exactly what he means by "invalid," it appears he is arguing that the statute (18 U.S.C. § 922(g)(1)) is categorically unconstitutional. This position, however, is a bit confusing in that the Defendant cites extensively to Justice Barret's dissent in *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019), that appeared to include an "as applied" approach in assessing whether the particular felony created a threat to public safety rather than a categorical bar or allowance. *Kanter* at 458. And yet, he now seeks a ruling categorically excluding all felons from the reach of 18 U.S.C. § 922(g)(1) based on the rule announced in *Bruen*. Interestingly, the Defendant tacitly offers a mild as-applied claim when he suggests that his purchase was of a rifle "that is 'in common use' for self-defense." Motion at pgs. 3-4. This assertion is problematic in that the rifle he purchased (a .338) is a high powered, long-range sniper or hunting style rifle, not normally associated with self-defense. Similarly, one of the other firearms the Defendant attempted to purchase in relation to another count is a 5.7 caliber pistol that is a high velocity round that is often sought by criminals because it can pierce police grade body armor. The United States will address *Kanter* more thoroughly below.

3

arms. Motion at pg. 3. He then concludes that the Second Amendment covers his alleged conduct: possessing a firearm as a felon. *Id*. He follows this with the assertion that because 18 U.S.C. § 922(g)(1) restricts firearm possession for felons it "is in conflict with the plain text of the Second Amendment" and "is presumptively invalid." *Id*. Lastly, he claims that the United States faces an "insurmountable burden in rebutting the presumption that 922(g)(1) is invalid" because it will be unable to show that the regulation is consistent with historical tradition. Motion at pg. 4.

The Defendant's argument fails on multiple fronts.

### B. The United States' Response and Argument

#### 1. Framework for Second Amendment Claims

The Second Amendment states, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment protected an "individual" right to keep and bear arms, not merely a right tethered to militia service. 554 U.S. 570, 595 (2008). *Heller*, however, emphasized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626.

*Heller* explained, "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id. Heller* specifically stated, "nothing in our opinion should be taken to cast doubt on longstanding prohibitions

on the possession of firearms by felons . . . ." *Id.* at 627 (listing three additional examples of presumptively reasonable categories of firearm regulations).

In *McDonald v. City of Chicago*, a plurality of the Court "repeat[ed]" its "assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" 561 U.S. 742, 786 (2010) (quoting *Heller*, 554 U.S. at 626).

*Bruen* did not call these statements in *Heller* or *McDonald* into question. Rather, *Bruen* clarified the analysis to use in determining whether a regulation comports with the Second Amendment.

In doing so, *Bruen* left much existing Second Amendment jurisprudence intact. *Bruen*'s first step, determining whether the text of the Second Amendment covers an individual's conduct, is the same first step that many courts of appeals had been applying before *Bruen*. 142 S. Ct. at 2126 (at step one of the analysis courts of appeals had been applying, "the government may justify its regulation by 'establish[ing] that the challenged law regulates activity falling outside the scope of the right as originally understood'" (quoting *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019)); *see* 142 S. Ct. at 2127 (noting with regard to courts of appeals' current approach, "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history").

So, while it is true that to the extent that courts of appeals applied "means-end" scrutiny to analyze a regulation of firearm rights, *Bruen* overruled those decisions. *Id.* However, to the extent a court analyzed whether the Second Amendment by its text

applied to certain conduct, *see, e.g.*, *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019) (examining history and holding "that a felony conviction removes one from the scope of the Second Amendment"), *Bruen* did nothing to disturb that analysis.

> 2. The Defendant's Argument that the Second Amendment provides him with the right to possess firearms fails because restricting firearm possession for felons does not implicate the Second Amendment

As *Heller* recognized, federal law has long restricted the possession of firearms by certain categories of individuals. 554 U.S. at 626. One such longstanding disqualification, 18 U.S.C. § 922(g)(1), (generally) prohibits the possession of firearms by any person "who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year," the traditional definition of a felony. For purposes of § 922(g)(1), "[t]he term 'crime punishable by imprisonment for a term exceeding one year' does not include" a "State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less." 18 U.S.C. § 921(a)(20)(B). It also excludes "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored." *Id.* § 921(a)(20).[3]

The Defendant is subject to §922(g)(1)'s prohibition because he knew he had been convicted of *Driving under the Influence of Alcohol* in the Third District Court (case no.

---

[3] Congress also excluded any "Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." 18 U.S.C. § 921(a)(20)(A).

151907906), State of Utah, a 3rd degree felony punishable by up to five years in prison under Utah law.

The Defendant's assertion that being a citizen provides him constitutional protection with regard to any rights included in the Second Amendment is overly simplistic and facile, and thereby woefully inaccurate.

This is because the Second Amendment protects "the people." U.S. Const. amend. II. Thus, part of the inquiry in *Bruen*'s first step is determining whether the Defendant is "part of 'the people'" to whom the Second Amendment was intended to apply. *Bruen*, 142 S. Ct. at 2134.

The Supreme Court has made it abundantly clear that "the people" described in the Second Amendment is "ordinary, law-abiding, adult citizens." *Id.* Just as *Heller* defined "the people" in civic-minded terms as "members of the political community" and noted that "nothing . . . should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," 554 U.S. at 580, 627, *Bruen* defined individuals to whom the Amendment applied as "law-abiding" citizens. 142 S. Ct. at 2131 ("[t]he Second Amendment . .. surely elevates above all interests the right of law-abiding, responsible citizens to use arms for self-defense."). In fact, *Bruen* and its concurring opinions define the Second Amendment as applying to "law-abiding citizens" at least twenty-one times. *See id.* at 2122, 2125, 2133, 2134, 2138, 2150, 2156, 2157, 2158, 2159, 2161.

The *Bruen* Court determined that permissible licensing schemes (like categories) will "often require applicants to undergo a background check . . . designed to ensure

*only that those bearing arms in the jurisdiction are, in fact, law-abiding and responsible citizens.*" *Id.* at 2138 n.9 (emphasis added); *see also id.* at 2162 (Kavanaugh, J., concurring) ("regimes [that] may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training . . . are constitutionally permissible.").

Likewise, though prior to *Bruen*, the Tenth Circuit has consistently rejected Constitutional challenges to 18 U.S.C. § 922(g)(1), following the dictum in *Heller*. *See United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009) (rejecting defendant's argument that § 922(g)(1) violates the Second Amendment and noting that the Supreme Court "explicitly stated in *Heller* that 'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons'"); *see also United States v. Baer*, 235 F.3d 561, 564 (10th Cir. 2000) ("federal legislation regulating the receipt and possession of firearms by felons 'do[es] not trench upon any constitutionally protected liberties, including those guaranteed by the Second Amendment.'") (citing *Lewis v. United States*, 445 U.S. 55, 65 n.8 (1980)) (internal quotations omitted).

Several courts of appeals have recognized that any offense serious enough to satisfy 18 U.S.C. § 922(g)(1) necessarily excludes the offender from the class of law-abiding citizens protected by the Second Amendment. *See, e.g.*, *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) ("reaffirm[ing] the Fifth Circuit's pre-*Heller* jurisprudence "that criminal prohibitions on felons (violent or nonviolent) possessing) possessing firearms" does not violate the Second Amendment) (citations

omitted); *United States v. Rozier*, 598 F.3d 768 771 (11th Cir. 2010) (holding that Rozier was not "qualified to possess a firearm" per *Heller* (emphasis in original); *McCane* 572 F.3d at 1047. To further demonstrate this point, "no circuit" has even "held [18 U.S.C. § 922(g)(1) unconstitutional as applied" for fraud or any other purportedly "non-violent" offense that the relevant jurisdiction has labeled as a felony. *Medina*, 913 F.3d at 155.

Legal scholarship also confirms what the *Heller* and *Bruen* majority and concurrences have said in dicta: felons were not part of the "political community" protected by the Second Amendment. *See* Saul Cornell, "*Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002) ("[p]erhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as a civic right [that]. . . was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner."); Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983) ("Felons simply did not *fall within* the benefits of the common law right to possess arms.") (emphasis added); John Trenchard & Walter Moyle, *An Argument Shewing, That a Standing Army is Inconsistent with a Free Government, and Absolutely Destructive to the Constitution of the English Monarchy* 7 (1697) (noting that the "virtuous citizen" concept was ingrained in republicanism, such that its proponents emphasized that a firearm should not be "lodg'd in the hand of any who had not an Interest in preserving the publick Peace").

Indeed, according to Thomas M. Cooley's 1868 *Treatise on Constitutional Limitations*, which the *Heller* Court treated as a highly persuasive treatise written by

"[t]he most famous" late-nineteenth-century legal scholar, 554 U.S. at 616, certain classes of people were "almost universally excluded" from exercising core civic rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868).

In brief, long standing and recent jurisprudence as well as historical constitutional limits demonstrate that the Defendant's felony conviction for *Driving under the Influence of Alcohol* removes him from the category of "law-abiding and responsible citizens" to whom the Second Amendment applies.

3. Prohibiting the possession of firearms by felons is consistent with our nation's tradition of firearm regulation

Even if the Second Amendment by its terms did apply to persons with felony convictions, the Defendant's motion also fails under *Bruen*'s second step, because prohibiting the possession of firearms by felons "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

**a. Framework of *Bruen*'s second step**

In noting that the government bears the burden as to Bruen's second step, the Supreme Court did not require that the government identify a "historical twin" to the modern-day prohibition. *Id*. at 2133. The Supreme Court recognized that "historical analysis" of laws and regulations that existed in the late-eighteenth century "can be difficult," because "the regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791." *Id*. at 2131, 2132.

10

Therefore, modern courts may (and often must) conduct "reasoning by analogy," which requires identification of a "well-established and representative historical analogue, not a historical twin." *Id.* at 2133 (emphasis in original). Finally, even where the "historical record yields relatively few" direct examples, those few examples may pass constitutional muster where there is little record of any "disputes regarding the lawfulness of such prohibitions." *Id.*

### b. The Founders recognized the need to consider public safety as part of a proposed right to keep and bear arms

Under the *Bruen* framework, several historical analogues appear. The "strongest source" for understanding the Founders' view of the right to bear arms "comes from proposals for the Second Amendment issued by various State conventions." *United States v. Tooley*, 717 F. Supp. 2d 580, 590 (S.D. W. Va. 2010). These proposals "provide some understanding of the founders' view of this pre-existing right before it was codified, in addition to serving as 'precursors' to the amendment itself." *Id.* (quoting *Heller*, 554 U.S. at 604).

*Heller* identified the Address and Reasons of Dissent of the Minority of the State of Pennsylvania to their Constituents as a "highly influential" "precursor" to the Second Amendment. 554 U.S. at 604. And that proposal suggested that "no law shall be passed for disarming the people or any of them *unless* for *crimes committed*." Bernard Schwartz, 2 *The Bill of Rights, A Documentary History* 662, 665 (1971) (emphasis added). The Pennsylvania proposal is "highly influential" because it "represents the view of the Anti-federalists," which consisted of those founders who were "advocating for very limited

11

federal power, opposing the Constitution generally, but advocating for a strong Bill of Rights. Even these advocates of broad individual . . . rights viewed the right to possess and carry arms as limited – particularly from those who had committed crimes or were a danger to the public." *Tooley*, 717 F. Supp. 2d at 590.

"The Pennsylvania minority was the first to propose an extensive Bill of Rights and their seminal ideas found their way into the Bill of Rights and became the first, second, fourth, fifth, sixth, eighth, and tenth amendments." Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign*, 36 Okla. L. Rev. 65, 77 n. 54 (1983).

That the view expressed by the Anti-Federalists in Pennsylvania did not win the day in their own state's vote on ratification is not dispositive because their views gained momentum as the various states held their ratifying conventions.

Pennsylvania was the second state, after Delaware, to hold its ratifying convention, and the first state to mount a challenge by any portion of its delegates to the Constitution's initial lack of a Bill of Rights. Stephen J. Halbrook, *The Founders' Second Amendment* 171, 191-93 (2008). Eventually, other states followed suit. In Massachusetts, the sixth state to ratify, "[t]he demand for a bill of rights reached a high pitch." *Id.* at 201.

The bill of rights proposed by the Pennsylvania Dissent of Minority was becoming influential throughout the country and "had been circulated in Boston when the Massachusetts convention met." *Id.* at 208. As in Pennsylvania, those in Massachusetts demanding a Bill of Rights were defeated by their opponents, but by a much narrower

12

margin than the minority in Pennsylvania. *Id.* at 207.[4] Samuel Adams' proposed amendments included language clarifying that "the said Constitution be never construed to authorise Congress, to infringe the just liberty of the press, or the rights of conscience; or to prevent the people of the United States, **who are peaceable citizens**, from keeping their own arms." *Id.* at 205 (emphasis added).

Finally, in New Hampshire, what had been a minority view in Pennsylvania became a majority: "[i]nsistence on a bill of rights – which mustered the votes only of minorities in the Pennsylvania and Massachusetts conventions – finally commanded a majority in the New Hampshire convention." *Id.* at 215.

Like Pennsylvania's proposed Second-Amendment predecessor and Samuel Adams' proposal for Massachusetts, New Hampshire's proposal contained a safety-based limitation. It read, "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion." *Id.* at 213. Concerns about citizen-led violence born out of recent events such as Shay's rebellion in Massachusetts inspired the proposal that "'actual' insurgents could be disarmed." *Id.* The government is "aware of no disputes regarding the lawfulness of such prohibitions." *Bruen*, 142 S. Ct. at 2133.

After New Hampshire, and beginning with Virginia, the remaining states to ratify the Constitution all included with their ratification vote a demand for a bill of rights. Halbrook, *The Founders' Second Amendment* at 234. When James Madison eventually

---

[4] As in Delaware, the delegates from New Jersey, Georgia, and Connecticut – the third, fourth, and fifth states, respectively, to vote on ratification – proposed no bill of rights. Halbrook, *The Founders' Second Amendment* at 199-201.

authored what would become the current Bill of Rights, including the Second

Amendment predecessor, "Samuel Adams and the drafters of the New Hampshire

proposal did not object to [any] lack of an explicit exclusion of criminals from the

individual right to keep and bear arms, because this . . . was understood." *Id.* at 273.

### c. Founding Era treatment of felons confirms that felon-in-possession laws comport with historical tradition

In the Founding Era, many felonies were punishable by death, rendering the issue

of post-felony gun relinquishment moot. *See Baze v. Rees*, 553 U.S. 35, 94 (2008)

(Thomas, J., concurring in the judgment) (noting that capital punishment for felonies was

"ubiquit[ous] in the late Eighteenth Century and was "the standard penalty for all serious

crimes."). These harsh sentences were not restricted to "crimes of violence" or

"dangerous crimes." The First Congress treated "forgery, [dealing in] forged securities,

[and] counterfeiting" as capital crimes. *Folajtar v. Att'y Gen. U.S.*, 980 F.3d 897, 905 (3d

Cir. 2020) (first alteration in original) (quoting John D. Bessler, *Cruel & Unusual: The

American Death Penalty and the Founders' Eighth Amendment* 56-57 (2012)). Several

states similarly subjected forgers to the death penalty. *See* Thomas Herty, *A Digest of the

Laws of Maryland* 255-56 (1799) (forgery punishable by "death as a felon, without

benefit of clergy"); 2 *Laws of the State of New York* 74 (1791) (an individual convicted of

forgery "shall be hanged by the neck until he . . . shall be dead"); *see also* 1 *The Laws of

the Commonwealth of Massachusetts* 250, § 5 (1807) (forgery of bank bills may be

punishable by death).

Even in cases where felons were not put to death, at common law felons were "'civilly dead,' having lost all rights including the right to possess property of any kind." Don B. Kates, *A Modern Historiography of the Second Amendment*, 56 UCLA L. Rev. 1211, 1231 n.100 (2009); *see* Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461, 463 (2009) (observing that "felony" at English common law referred to a "breach of the feudal obligations between lord and vassal," the consequences of which was "forfeiture of goods and the escheat of the fief"). Given the treatment of felons at the time, it is difficult to imagine the Founders considering felons an indispensable part of the "political community." *Heller*, 554 U.S. at 580.

People in the Founding Era "saw the armed citizenry . . . as a bulwark of liberty, in contrast to felons who could not be trusted." *Folajtar*, 980 F.3d at 905 (internal citation omitted). Unsurprisingly, at the time of the Founding, any state "which accepted the right to arms invariably extended that right only to virtuous citizens . . . ." Kates, 56 UCLA L. Rev. at 1231 n.100. As the Seventh Circuit has noted, all "nonviolent felons" were "excluded from firearm possession at the time of the founding." *Kanter*, 919 F.3d at 445-46 (citing *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam)).[5]

---

[5] A recent decision from the Western District of Oklahoma helps confirm that felon-in-possession laws are consistent with the Nation's historical traditions. In *United States v. Jackson*, the defendant moved to dismiss an indictment charging a violation of 18 U.S.C. § 922(g)(9), possessing a firearm after a former misdemeanor crime of domestic violence. No. CR-22-59-D, 2022 WL 3582504 at *1 (W.D. Okla. Aug. 19, 2022) (unpublished). The district court held that the government's "reliance on general historical tradition" was "sufficient to satisfy its burden" under step two of the *Bruen* analysis, and the court therefore declined to hold § 922(g)(9) unconstitutional. *Id.* at *3-4. Notably, based on the reluctance of Founding-Era courts to interfere in domestic relationships, the court held that the government had failed to show under step one of *Bruen* that the Second Amendment inherently excluded domestic violence

In her *Kanter* dissent, Justice Barrett opined that legislatures historically "have the power to prohibit dangerous people from possessing guns." 919 F.3d at 451. Congress, in enacting felon-in-possession statutes, exercised precisely this power. The *Kanter* dissent and Congress's enactment of § 922(g)(1) differ only with respect to their definition of dangerousness. Congress has defined "dangerousness" in the context of firearm possession to coincide with those most likely to eschew the restrictions and rules of government: persons who commit felonies. *See United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004)[6] ("Irrespective of whether [the] offense was violent in nature, a felon has shown manifest disregard for the rights of others. He may not justly complain of the limitation on his liberty when his possession of firearms would otherwise threaten the security of his fellow citizens."); *Kaemmerling v. Lappin*, 553 F.3d 669, 683 (D.C. Cir. 2008) ("[N]onviolent offenders not only have a higher recidivism rate than the general population, but certain groups – such as property offenders – have an even higher recidivism rate than violent offenders, and a large percentage of the crimes nonviolent recidivists later commit are violent.") (citing U.S. Dept. of Justice, Bureau of Justice Statistics, P. Langan & D. Levin, *Special Report: Recidivism of Prisoners Released in 1994*, p.1 (June 2002)).

---

misdemeanants. *Id.* at *3. Only by analogy to longstanding prohibitions on firearm possession by *felons* could the government justify regulating firearms for domestic violence misdemeanants. *See id.* at *4 (quoting *Heller* and holding that "[d]omestic violence misdemeanants can logically be viewed as 'relevantly similar to felons' who should be 'denied weapons for the same reasons'") (additional citation omitted). *Jackson* reinforces the presumptive reasonableness of firearm restrictions for felons.

[6] Although *Everist* predates *Heller*, the Fifth Circuit had recognized three years before *Everist* that the Second Amendment guarantees an individual right to possess firearms. *United States v. Emerson*, 270 F.3d 203, 260 (5th Cir. 2001).

Some legal scholars and jurists may disagree with where Congress drew the line between "law-abiding" and non-"law-abiding" citizens. However, more individualized, post-hoc inquiries about each offender's "dangerousness" would likely prove unworkable, due to practical and fair-notice problems. *See Medina*, 913 F.3d at 301-02 ("[u]sing an amorphous 'dangerousness' standard to delineate the scope of the Second Amendment would require the government to make case-by-case predictive judgments before barring the possession of weapons by convicted criminals, illegal aliens, or perhaps even children."); *Kanter*, 919 F.3d at 450 ("[s]uch an approach, applied to countless variations in individual circumstances, would obviously present serious problems of administration, consistency and fair warning.").

In any event, such line-drawing determinations are best carried out by the people's elected representatives, rather than judges and legal scholars. *See Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013) ("In the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks.") (citation and quotation marks omitted).

So, although the government has not identified a "historical twin" to felon-in-possession laws from the Founding Era, several "historical analogues" demonstrate that § 922(g)(1) is consistent with the Founders' view of reasonable limits on gun possession including restrictions on firearm possession by felons and others. *Bruen*, 142 S. Ct. at 2133. Thus, the government has met its burden under *Bruen*'s second step to show that §

922(g)(1) is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126.

### 4. *Kanter*

The Defendant relies heavily on Justice Barrett's dissent in *Kanter v. Barr*, but the reasoning in her dissent as a Seventh Circuit justice (non-mandatory authority) does not require a different result than what the United States has argued for above.

The *Kanter* dissent proposed that founding-era legislatures placed "virtue-based restrictions" only on "civic rights" – such as voting and jury service – not to "individual rights" like the right to possess a firearm for self-defense.[7] *Kanter* at 451. But there is nothing in *Heller* or *Bruen* that supports this distinction. *See Binderup v. Att'y Gen. U.S.*, 836 F.3d 336, 349 (3d Cir. 2016 (en banc) ("[p]ersons who have committed serious crimes forfeit the right to possess firearms in much the way 'they forfeit other civil liberties'" (citation omitted).

The *Kanter* dissent cites little authority to support the elevation of rights in the Second Amendment over the right to vote, which the Constitution itself clearly secured as an individual right at the time it was ratified. U.S. Const. Article I, Sec. 2 (providing for direct election of House members "by the People of the several States"); *see also Reynolds v. Sims*, 377 U.S. 533, 569 (1964) ("an individaul's right to vote for state legislators is unconstitutionally impaired when its weight is in substantial fashion diluted

---

[7] As noted above, the Defendant's Motion fails to explicitly clarify if his attack on 18 U.S.C. § 922(g)(1) is categorical or as applied. The reasoning employed by Justice Barrett in *Kanter* does offer a quasi-as-applied approach, but, while getting to this point, also concludes that the Second Amendment is an "individual" right rather than a mere "civic" right and is therefore deserving of greater protection. The Defendant does not really develop an as applied analysis, so the United States will focus on Justice Barrett's attempt at distinguishing levels of "rights."

when compared with votes of citizens living in other parts of the State"); *Vote.Org v. Callanen*, 39 F.4th 297, 303 (5th Cir. 2022) (in assessing whether a Texas "wet signature" requirement infringed on an individual's right to vote under the First and Fourteenth Amendments, noting that "an organization plainly lacks the right to vote"); *see also Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("The right to vote . . . is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."). No Supreme Court opinion, nor any other Justice, has adopted this distinction between civic rights and individual rights as Justice Barrett attempted to do.

But, even assuming the *Kanter* dissent is correct that the rights in the Second Amendment are more closely protected than the right to vote, Constitutional rights nonetheless carry inherent limitations. *See, e.g., Robertson v. Baldwin*, 165 U.S. 275, 287-88 (1897) (Thirteenth Amendment, outlawing slavery and "involuntary servitude" generally, was always understood to contain an exception for seamen having signed a contract to sail). *Robertson* recognized that the Bill of Rights protections are not absolutes but subject to well-recognized exceptions, and so the First Amendment does not permit the publication of libels, the Second Amendment "is not infringed by laws prohibiting the carrying of concealed weapons," the Double Jeopardy clause does not preclude retrial where the jury fails to agree, and the Confrontation Clause does not exclude dying declarations, etc. *Id.* at 283; *see Peterson v. Martinez*, 707 F.3d 1197, 1201 (10th Cir. 2013) (citing *Robertson*, as well as *Heller*, in rejecting challenge to a Colorado concealed handgun statute).

Indeed, other "individual rights" recognized in the Bill of Rights are unavailable to certain groups. The Fourth Amendment's individual right to be free from unreasonable searches and seizures, for example, does not apply to incarcerated persons. *Hudson v. Palmer*, 468 U.S. 517, 526 (1984) ("[n]otwithstanding our caution in approaching claims that the Fourth Amendment is inapplicable in a given context, we hold that . . . the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell."); *Garcia v. Lawrence*, 118 F. App'x 436, 438 (10th Cir. 2004) (unpublished) ("[a] prisoner enjoys no Fourth Amendment right in his prison cell.") (citing *Hudson*, 468 U.S. at 526); *see also Bell v. Wolfish*, 441 U.S. 520, 546 (1979) ("[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."); *Denson v. United States*, 424 F.2d 329, 331 (10th Cir. 1970) ("[t]hat prison officials may inspect or examine the effects and communications of prison inmates without depriving the inmates of their constitutional rights is well established.").

In truth, incarcerated persons and felons are overlapping groups. Membership in both groups is earned by conduct rather than being based on immutable traits. Just like incarceration, and as noted above, felon status may be permanent or temporary. *See* 18 U.S.C. § 921(a)(20) (excluding from § 922(g)(1) "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored . . ."); *see United States v. Mayfield*, 810 F.2d 943, 946 (10th Cir. 1987) (reversing district court's determination that a conviction imposed without jurisdiction was "void ab initio," and holding that "[w]hile Mayfield's prior conviction became void

20

when the federal district court granted his *in limine* motion, it was not void when Mayfield allegedly purchased the weapons. Mayfield *was, at that time,* a convicted felon.") (emphasis added); *United States v. Kahoe*, 134 F.3d 1230, 1233-34 (4th Cir. 1998) ("The plain language of § 921(a)(20) means that a conviction that has been set aside can no longer be disabling. The language does not provide that such a conviction was not disabling between the time it was obtained and the time it was set aside").

Most importantly, the core justification for denying certain Constitutional rights to felons and to incarcerated persons is the same core justification underlying the Second Amendment: safety, both personal and public. *Compare Wolfish*, 441 U.S. at 547 ("even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in light of the central objective of prison administration, safeguarding institutional security."), *and Binderup*, 836 F.3d at 3503, ("[n]o doubt § 922(g)(1) is intended to further the government interest of promoting public safety by 'preventing armed mayhem'") (quoting *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010)), *with Bruen*, 142 S. Ct. at 2131 ("[t]he Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all interests the right of law-abiding, responsible citizens to use arms' for self-defense." (quoting *Heller*, 554 U.S. at 635) (emphasis in original)).

Thus, even if the right to bear arms is a heightened individual right, there is significant jurisprudence justifying restrictions or limitations on that right, including prohibiting felons from possessing firearms.

### III. Conclusion

The Court should deny the Defendant's Motion to dismiss count 2 because the Second Amendment does not provide a protection or right to bear arms for felons (non-"law-abiding citizens"), and because, even if it did, 18 U.S.C. § 922(g)(1)'s prohibition of firearm possession by felons comports with historical tradition.

RESPECTFULLY SUBMITTED this 21st day of September, 2022.

TRINA A. HIGGINS
United States Attorney


/s/ Sam Pead
SAM PEAD
Assistant United States Attorney